IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BRANDON D. BRADLEY, SR., a.k.a.
BRITTNEY HARDAWAY BRADLEY,

                    Plaintiff,                                  OPINION and ORDER
        v.
                                                                    20-cv-49-jdp
ROBERT VAN NORMAN, DEPUTY FLOYD,
and NICK SKREPENSKI,

                    Defendants.[1]

Pro se plaintiff Brandon Bradley, also known as Brittney Bradley, is currently a prisoner at Green Bay Correctional Institution.[2] Bradley contends that when she was a prisoner at Dane County Jail, staff used excessive force against her during a cell extraction. Bradley had mistakenly been given medication belonging to another inmate, and she refused to return it. Defendant officers, who were aware that Bradley has a history of self-harm and of threatening staff, entered the cell and physically subdued Bradley. I granted Bradley leave to proceed on Fourteenth Amendment excessive force claims against the officers.

The parties have filed cross-motions for summary judgment and a series of other motions on preliminary issues, all of which I will decide in this opinion. Because Bradley fails to present evidence that could lead a jury to conclude that defendants used an unreasonable

---

[1] I have amended the caption to include the proper spelling of defendants' names, as reflected in their filings.

[2] Bradley is a transgender woman. *See Bradley v. Novak*, No. 20-cv-48 (W.D. Wis.). In keeping with the court's practice in previous cases, I will use feminine pronouns to refer to Bradley.

amount of force, I will deny Bradley's motion for summary judgment, grant defendants' motion for summary judgment, and dismiss the case.

PRELIMINARY MATTERS

## A.  Motions about retaliation and access to the courts

I begin with some preliminary motions.

Bradley filed a series of motions or requests for leave to file motions asking the court to intervene in her treatment by jail staff: she states that staff retaliated against her pursuing this lawsuit by ending her legal loan, blocking her outgoing mail, and placing her in solitary confinement. Dkt. 99; Dkt. 100; Dkt. 109. But her claims of retaliation are not part of this lawsuit, so I cannot consider them here. I would intervene in the jail's administration of legal loan and mail matters only in the rarest circumstance in which a plaintiff could show that jail officials were blocking an inmate's access to the court. But Bradley does not show that here. She has been able to file numerous documents in this court, in this case and several others, and in any event, shortly after she filed her motions she was transferred out of the jail to Wisconsin DOC custody.

Bradley also argues that there is no legal basis to transfer her to DOC custody and she asks for a federal criminal investigation to be opened into both jail and DOC staff's misconduct against her. But I cannot consider the lawfulness of her confinement in this civil rights lawsuit, nor does this federal court initiate investigations in criminal matters.

Along with her filings regarding alleged retaliation, Bradley stated that she intended to file a motion for sanctions "at summary judgment" against defendants for introducing fabricated video evidence. Dkt. 109. She followed that submission with a declaration in which

she stated that she objects to any video evidence offered by defendants. Dkt. 114, ¶ 26. But defendants say that there is no video footage of the cell extraction at issue, they have submitted no video evidence, and Bradley did not follow up with a motion for sanctions as she warned she would file. So I need not address this issue further.

## B.  Motion to compel discovery

Bradley has filed a motion to compel discovery of various materials both in this case and case no. 20-cv-50-jdp. Dkt. 106. The pertinent information she seeks in this case includes video evidence, the incident report, and responses to interrogatories. Defendants respond, objecting to Bradley's repeated use of discovery methods mixing her requests meant for two different lawsuits. I agree with defendants that it is inappropriate for Bradley to file discovery requests that are difficult to respond to because they jumble requests from two cases together. In any event, defendants say that there is no video evidence to turn over and that they have provided Bradley with the documents she seeks. Bradley didn't file a reply disputing this, so I will assume that this portion of her motion is moot. Bradley also states that defendants failed to properly answer interrogatories, but she doesn't say which interrogatory responses she challenges or explain why they are insufficient. So I will also deny this portion of her motion to compel.

## C.  Motion to seal

Defendants have submitted Bradley's unredacted medical records relevant to the use of force here, along with a motion for leave to file those records under seal under Federal Rule of Civil Procedure 5.2(d). Dkt. 125. But any documents that "influence or underpin the judicial decision are open to public inspection unless" the documents include "trade secrets," "information covered by a recognized privilege," or "information required by statute to be

maintained in confidence." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545–46 (7th Cir. 2002). Because the extent of Bradley's injuries from the use of force is an issue in this case, she "has waive[d] any applicable privileges or statutory protections that [her] medical records would have otherwise had." *Vogelsberg v. Kim*, No. 17-cv-596-jdp, 2019 WL 3802874, at *4 (W.D. Wis. Aug. 13, 2019) (internal quotations omitted). Bradley's relevant medical records belong as part of the public record.

Nonetheless, I won't unseal the current version of the records. Under Rule 5.2(a), defendants were required to redact certain personal identifiers of Bradley's, but they did not. I will keep the current version of those documents under seal, but I will order defendants to file new, redacted copies of those documents for the public record.

## UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Bradley was incarcerated at the Dane County Jail in May 2019. On May 31, a nurse (who is not a defendant) was distributing medications to inmates at the jail, arrived at Bradley's cell, and incorrectly handed Bradley medications (Depakote and Haldol) meant for another inmate. Bradley is allergic to both medications and she believes that taking them would have caused her serious harm.

Bradley realized she was handed the wrong medications, notified the nurse, and then placed the medications inside her bra. When the nurse asked Bradley to return those medications to her, Bradley refused. Instead, Bradley shouted profanities at the nurse and she demanded to speak to a supervisor.

Deputy Coffey (who is not a defendant) told the nurse to leave the area because Bradley might "do something." Coffey spoke with Bradley for 20 to 30 minutes. Coffey told Bradley to give her back the medication, but Bradley refused, saying that she did not feel safe at the jail. She thought that the nurse had intentionally given her dangerous medication and she discussed other incidents at the jail that she said showed she was unsafe. Defendant Deputy Robert Van Norman spoke with Bradley for another 15 to 30 minutes. Van Norman told Bradley to give the medications back; Bradley refused.

Defendant Sergeant Nick Skrepenski, a jail supervisor, talked with Bradley for another 5 to 10 minutes. Bradley again refused Skrepenski's requests to give the medication back. Defendants state that Bradley said that she would not give the medication back unless she was released from jail. Bradley says that because of this and other events she feared for her safety and that she intended to post bail or have it posted for her. Skrepenski gave Bradley a final chance to return the medications, stating that deputies would enter her cell and forcefully take the medications if she refused to return them. Bradley confirmed that she would not return the medications.

Defendant Skrepenski led a group of several officers, including defendants Van Norman and Deputy Floyd, who gathered outside Bradley's cell. Based on jail records, the officers believe that Bradley was a threat to herself and others, and that she was a particularly unpredictable and dangerous inmate. Those records show that Bradley had a history of attempting self-harm and of threatening to harm staff or their families, including multiple statements that she would shoot staff. In one incident, Bradley stated that she had tried to take a deputy's gun while they were both at the hospital and that she would have shot the deputy with it.

Bradley admits that she also has a history of concealing shanks or other weapons at least several times since being incarcerated at the jail. For instance, records show that Bradley once brandished a sharpened toothbrush at a court hearing. Shortly thereafter, Bradley received medical attention after she inserted a toothbrush shank into her rectum to prevent jail officials from finding it. In another incident, a pat-down search revealed that Bradley had concealed a broken shower head inside a sock.

Records show that in the month leading up to the cell extraction at issue in this case, Bradley was involved in various misconduct. She threw water or lemonade on staff four times, repeatedly told staff that she would kill them, told a deputy that she would make a shank and stab a judge, and threatened to spit or throw feces on staff. Bradley disputes that some of these incidents occurred, but at her deposition she admitted she had a history of self-harm attempts and of attacking staff. *See* Dkt. 127, at 11–12. And in any event, the records are not submitted for the underlying truth that Bradley actually engaged in all of this misconduct, but rather to show that the officers were aware of the documented history of Bradley's misconduct, leading them to believe that she was particularly dangerous.

The officers approached Bradley's cell with two "stun shields," shields with built-in electric stun devices. Bradley says that the officers "tested" the shields, by which I take her to mean that they activated the stun devices to make sure they worked. While testing the shields, Van Norman and another officer said, "Bradley this is going to hurt." Dkt. 63, ¶ 7. Bradley started removing her clothing and told the deputies that she was falsely imprisoned and that "[a]nything you do to me, I will take as a threat against my life, and I will defend myself in good faith." Dkt. 127, at 26.

6

The officers were not wearing riot gear and did not bring a camera with them to film the extraction. Bradley asked where the camera was, and one of the officers told her to look at a camera on the wall. Bradley said, "so you're going to put a spit mask on [me] . . . and do everything by the book when in reality you're going to use excessive force like Waupun did. Uh?" *Id.* Ohe of the officers replied, "yeah." *Id.* I take Bradley to be saying that officers did not put a spit mask on her, even though it would have been part of the ordinary cell-extraction protocol.

As the officers prepared to enter the cell, Bradley states that she "stood [her] ground," planned to "stand firm to get out of the county jail by any means necessary," "was going to die with a bang," and wanted "see how far [the deputies were] willing to go." *Id.* at 27–28. When officers entered her cell, Bradley threw down the medication and backed away from physical confrontation, but she admits that she raised her hands and "pushed[ed] out a little." *Id.* at 35. Defendants came into the cell, "slammed" Bradley onto the bed face down, and held her down with stun shields, although they did not use the stun function. They kneed her, elbowed her, and twisted her arms, handcuffing her behind her back. More specifically, Bradley adds that the officers ground their elbows and knees into her and that they used "short knees" and "short elbows," by which I take her to mean that they struck her with their knees and elbows to subdue her. *Id.* at 40–41. Defendant Skrepenski said "from now on you're strictly forced around here." *Id.* at 33. An officer ripped off her bra during the altercation.

Bradley said that she was suicidal. The officers took Bradley out of the cell with her wearing only panties and they placed her in a restraint chair. Bradley says that they placed the restraints on her painfully tight, causing her to lose circulation. While Bradley was in the

restraint chair, she overheard the officers laughing, with one of them saying "we wish that could have lasted a little longer." *Id.* at 38.

Bradley says that she was "nicked up" and sore after the cell extraction, and she had cuts on her wrists and ankles from the restraint chair. *Id.* at 49. A nurse gave her Tylenol, which she took for "probably a couple weeks" for her injuries. *Id.* Bradley's jail medical record does not include a specific entry for her receiving Tylenol following the incident, nor does it show any other medical care related to injuries from the cell extraction.

ANALYSIS

Because it appeared that Bradley was a pretrial detainee at the time of the cell extraction at issue in this case, I granted Bradley leave to proceed on excessive force claims under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The parties agree the Fourteenth Amendment applies here. To succeed on an excessive force claim under the Fourteenth Amendment, a plaintiff must show that defendants' actions were objectively unreasonable. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018).

This determination is made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Courts must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks and alterations omitted); *see also Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("the calculus of reasonableness must embody allowance for the fact that police

8

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In reviewing an excessive force claim, relevant factors to be considered when reviewing an excessive force claim include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397.

There aren't many facts in dispute here: defendants have not presented their own first-hand accounts disputing Bradley's explanation of what happened before and during the cell extraction. But even accepting Bradley's version of events and viewing all of the circumstances facing defendants here in the light most favorable to Bradley, a reasonable fact finder could not conclude that defendants' use of force violated the Fourteenth Amendment. Put another way, Bradley has not produced evidence that could lead a jury to conclude that defendants acted objectively unreasonably.

Most of the above factors from *Kingsley* weigh strongly in defendants' favor. To start, defendants reasonably believed that they needed to intervene to take the medications away from Bradley. It is undisputed that she was mistakenly given the incorrect medications. Bradley had a documented history of self-harm and she would not give the medications back, even after four different staff members tried to resolve the standoff peacefully.

9

It was also reasonable for defendants to believe that they would need to use force to subdue Bradley and to protect themselves. Defendants present numerous reports of Bradley throwing liquids at staff, threatening to harm or kill them, and she had previously been found with shanks or other weapons.

Bradley contends that she did not actually resist defendants "at any point," but that is not entirely correct. She failed to comply with officers' directives and stated her intention to resist defendants. As defendants prepared to enter the cell, Bradley started removing her clothing and told the deputies "[a]nything you do to me, I will take as a threat against my life, and I will defend myself in good faith." Dkt. 127, at 26. At her deposition she stated that she "stood [her] ground," planned to "stand firm to get out of the county jail by any means necessary," "was going to die with a bang," and wanted "see how far [the deputies were] willing to go." *Id.*, at 27–28. When the officers entered her cell, Bradley says that she threw down the medication and backed away from physical confrontation, but she admits that she raised her hands and "pushed out." Bradley failed to follow through with violent resistance at the very last second, but her words and actions still gave defendants reason to forcibly subdue her for their protection, to ensure they could retrieve all the medication, and to transport her out of the cell.

As for the amount of force used by defendants, Bradley is generally vague about exactly what defendants did to subdue her. At various points in her deposition testimony she characterizes defendants' actions as "obnoxious amounts of force," "improper[]," and "outside . . . sheriff's policy," and that defendants were "completely unnecessarily just trying to inflict pain upon me." Dkt. 127, at 30–31, 38, 40–41. But her characterization of defendants' actions isn't evidence. What matters is the specific actions Bradley says that they took. She says that

defendants pushed her onto the bed and held her down with stun shields, although they did not use the stun function. They ground their elbows and knees into her and they struck her with "short knees" and "short elbows."

What Bradley has described here is a reasonable use of force to gain compliance from a particularly intractable inmate. The mere fact that defendants used force on her such as knee and elbow strikes isn't enough to render their actions unreasonable, particularly given Bradley's resistance to voluntarily surrendering the medications and her history of threatening behavior. *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) ("Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority . . . is to be manageable."). *See Harper v. Stefonek*, 2019 WL 2422882 (E.D. Wis. 2019) ("escort holds" and knee strikes deemed reasonable at summary judgment: inmate plaintiff had history of disciplinary infractions, refused to comply with orders to return to cell, and used "dead weight" tactics to resist being placed back in cell); *King v. Spears*, 2019 WL 632290 (W.D. Wis. 2019) (granting summary judgment on Fourteenth Amendment claims to defendant officers who used chokehold and hand and knee strikes against inmate who resisted cell extraction and who had history of violence against officers). Bradley's lack of significant injury also points in favor of defendants: Bradley says that she was sore following the extraction, but she doesn't describe any acute injuries suggesting that defendants used extreme amounts of force.

Bradley points to other pieces of evidence in support of her claims. Defendants made comments about their use of force that support her claims—their statement that tasering from the stun shields would hurt, the response "yeah" to Bradley's statement that they would use excessive force, and their statement that they wished the extraction would have lasted longer.

These comments may have been intemperate, but they do not transform an otherwise objectively reasonable use of force into a Fourteenth Amendment violation. *Cf. Graham*, 490 U.S. at 397 ("[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force"). And in particular, I note that Van Norman's comment about how the stun shields were "going to hurt" wasn't followed by officers actually using the stun function.

Bradley also argues that defendants failed to follow protocols by failing to film the extraction or wear protective gear. She states that defendants ripped off her bra during the altercation and that afterward they placed her in a restraint chair with unnecessarily tight restraints. But a violation of the jail's internal regulations—such as protective-equipment or recording rules at the jail here—"is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). Regarding defendants' removal of her bra, they had good reason for concern that Bradley could be hiding a weapon in her clothing, and I note that Bradley does not bring a claim for sexual humiliation. Nor did I allow her to proceed on a claim about the manner by which defendants employed a restraint chair after the incident.

In summary, I conclude as a matter of law that defendants' use of force was objectively reasonable. Bradley's testimony describes a cell extraction made necessary by her repeated refusals to turn over the medication mistakenly given her and performed by officers who were aware that Bradley was a self-harm risk and a threat to harm them. So I will grant defendants' motion for summary judgment on Bradley's Fourteenth Amendment claims, deny Bradley's own motion for summary judgment, and dismiss the case.[3]

---

[3] Defendants also contend that they are entitled to qualified immunity on Bradley's claims.

ORDER

IT IS ORDERED that:

1.  Plaintiff Brandon D. Bradley's motions for the court to intervene in retaliation by jail staff, Dkt. 99; Dkt. 100; Dkt. 109, are DENIED.

2.  Plaintiff's motion to compel discovery, Dkt. 106, is DENIED.

3.  Defendants' motion to file medical records under seal, Dkt. 125, is GRANTED in part. The records defendants filed will remain under seal. They may have until March 11, 2022, to file new, redacted copies of those records on the public record.

4.  Plaintiff's motion for summary judgment, Dkt. 62, is DENIED.

5.  Defendants' motion for summary judgment, Dkt. 120, is GRANTED.

6.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered February 28, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

---

Because I am dismissing Bradley's claims on the merits, I need not consider defendants' qualified immunity arguments.